## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Robert Barroca, Robert Black, David Cilla   *   CASE NO:    1:18-cv-2740
Auburn Calloway, Corvain Cooper, Manuel  *
Gauna, Christopher Grief, Jeremy Hammond*
George Jefferson, III, Mark Jordan,        *
Brent Lovett, Jeremy Mack, James Mitchell, *
Ronald Myers, Jason Palacios, Scott Petrie,  *
Joseph Rector, Vernon Reid, David Rostan,  *
Michael Schuttpelz, Connor Stevens and   *
Abolitionist Law Center              *
                                  *
       v.                   *   COMPLAINT FOR DECLARATORY
                                  *   AND INJUNCTIVE RELIEF
BUREAU OF PRISONS; HUGH J.        *
HURWITZ, in his official capacity as     *
Director of the Federal Bureau of Prisons,  *
                                  *
     Defendants.             *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.

    This is a complaint for declaratory and injunctive relief. **Plaintiffs** bring this action to challenge the Defendant Federal Bureau of Prisons' ("BOP") March 3, 2018 decision to issue a Record of Decision ("ROD") in support of its proposed plan to build an unneeded new United States Penitentiary ("USP") in Letcher County, Kentucky at the cost of at least $444 million. BOP believes that USP Letcher would house approximately 1,216 federal inmates.

2.

    As proposed by BOP, USP Letcher would be constructed in the unincorporated hamlet of Roxana, Kentucky, which has a population of less than 100 people. USP Letcher's footprint is expected to cover approximately 570 acres. Development of the

project would permanently degrade the already vulnerable environment. It requires clear-cutting over 120 acres of forest habitat for endangered bat species, excavating and grading an additional 59 acres, destroying three acres of wetlands, building an entirely new wastewater utility in the region, and emitting thousands of pounds of additional greenhouse gas emissions.

3.

As can be seen from the photograph below originally published in the *Huffington Post*, BOP's proposed site for USP Letcher is a former coal mine where the former peak of a mountain was literally removed (colloquially known as mountain-top removal ("MTR")) in order to readily access coal.



4.

Coal companies throughout Kentucky and the Appalachian region have historically relied on MTR mining not because it was necessary but because it was the cheapest way to access coal in the area because it requires fewer workers. This type of mining, however, has resulted in serious and long-lasting impacts to the communities and environment where

the mining occurred.  For instance, coal companies fill the surrounding valleys adjacent to the mine with the rocks, minerals and dirt removed from the tops of the mountains.  These valley fills destroy headwaters and wetlands, and pollute the watershed with runoff of carcinogens and heavy metals such as selenium and manganese.  Such pollution can persist for decades after mining ceases.  Soil is also impacted from the diesel fuel used in blasting.

This pollution impacts those living near MTR sites, even if mining has stopped. Several peer review articles have indicated that 1) people living near mountaintop mining have cancer rates of 14.4% compared to 9.4% for people elsewhere in Appalachia; 2) the rate of children born with birth defects was 42% higher in areas near mountaintop removal mining; and 3) the public health costs of pollution from coal operations in Appalachia amount to a staggering $75 billion a year.

5.

Despite the clear and uncontroverted public health risks that communities in close proximity to MTR sites face, the BOP without a reasonable and legal justification continues to move forward with its plan to build USP Letcher and unnecessarily risk the health of its employees and inmates in its custody and control.

6.

In fact, the BOP's own parent agency – the United States Department of Justice – has repeatedly testified before Congress that it does not need to build USP Letcher to address overcrowding issues in the Mid-Atlantic Region.  Consequently, the only sensible reason that seems to support the BOP's decision is to satisfy Representative Hal Rogers' pork barrel politics so that federal tax dollars can be spent on construction and development contracts with his constituents.

7.

3

The National Environmental Protection Act ("NEPA") requires that any agency action that significantly impacts the environment have a legitimate purpose and need for such action.  Pork barrel politics is not a legitimate purpose and need.

8.

NEPA also requires that an agency fully consider a range of alternative actions to the one proposed by the agency.  BOP's restricted its "alternative analysis" to looking at different sites to building a prison to address its alleged "overpopulation" problem. It did not consider any well-documented alternatives actions besides building a new prison that could address this concern.

9.

In addition, an EIS is supposed to conduct an environmental justice analysis.  BOP's proposed action will disproportionately impact communities of color and low-income communities ("environmental justice communities"), considering that the vast majority of its inmate population are either people of color and/or low-income.  BOP's EIS and ROD did not conduct an environmental justice analysis.

10.

NEPA also guarantees the public the right to meaningfully participate in the administrative process leading up to the issuance of an ROD.  Prior to an ROD's publication, the agency must develop an Environmental Impact Statement ("EIS").  In turn, NEPA provides for mandatory public comment periods and that the agency make available to the public the EIS; as well as the draft EIS and its supporting documents.

11.

BOP, however, systematically excluded its entire inmate population from meaningfully participating in the public comment periods related to USP Letcher.  BOP

refused to post federal register notices and NEPA related documents related to USP Letcher in inmate law libraries.  BOP's inmate population is disproportionately made up of people of color, as the agency reports that 41 percent of its population are of non-white "minority" status, whereas this racial demographic only makes up approximately 25 percent of the entire U.S. population.

12.

As such, the Defendant BOP's ROD violates NEPA and Administrative Procedure's Act ("APA") by 1) failing to properly provide the Plaintiffs notice and the opportunity to comment on the BOP's proposed agency action; 2) failing to properly identify a legitimate purpose and need in its Environmental Impact Statement ("EIS") and supplemental EIS ("SEIS") for its proposed agency action; 3) improperly narrowing the EIS's purpose and need, resulting in the EIS and SEIS failing to consider legislatively required reasonable alternatives to the agency's proposed action to build USP Letcher; 4) failed to consider the direct, indirect and cumulative public health impacts on inmates and correctional officers who will live and work at USP Letcher; and 5) failed to conduct an environmental justice analysis.

13.

The Defendant impermissibly confined the scope of their NEPA analysis to actions and alternatives that would promote the construction of a new USP in Letcher County, Kentucky.  The BOP's narrow analysis precluded potential environmental impacts and reasonable alternatives; failed to sufficiently consider the full range of cumulative impacts, and in some cases failed to address certain impacts at all by improperly deferring consideration of reasonable foreseeable impacts to other agencies or to later stages of the permitting process.  The BOP's EIS, SEIS and ROD made numerous conclusions that

directly contradicted or ignored the evidence before the agency; and failed to adequately consider and respond to public comments.

14.

Collectively, these failings render the Defendants' decision arbitrary and capricious, and contrary to law, in violation of NEPA and the Administrative Procedures Act ("APA").

15.

For these reasons, Plaintiffs seek injunctive, declaratory and equitable relief, where this Court declares that the Defendants' actions are an unlawful, arbitrary and capricious agency action in violation of NEPA and the APA; and also enjoins the Defendants from any further activity related to constructing its proposed USP until the Defendants have fully complied with NEPA and APA.

## JURISDICTION AND VENUE

16.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (United States as defendant); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); 5 U.S.C. §§ 702, 704 (APA); 42 U.S.C. §§ 4321-4370h (NEPA).

17.

An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgment).

18.

Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which the defendant resides.

## PARTIES

19.

The Plaintiffs are all inmates serving sentences for criminal convictions in the custody and control of the Defendant BOP.  The BOP has arbitrarily and capriciously denied them, and all other federal inmates, the opportunity to participate in the agency's EIS decision-making process.

20.

Plaintiff Robert Barroca is currently housed at the Federal Medical Center in Lexington, Kentucky.  He is serving a thirty-year sentence and is currently classified as a medium security inmate.  His conviction originated in California, where his family is located. Due to Mr. Barroca's length of sentence and classification, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built. Mr. Barroca would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

21.

Plaintiff Robert Black is currently housed at the United States Federal Prison Camp in Florence, Colorado adjacent to the BOP's penitentiary.  He is serving a ninety-month sentence and is currently classified as a low security inmate.  Due to Mr. Black's length of sentence and classification, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built. Mr. Black would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

22.

Plaintiff Auburn Calloway is currently housed at the United States Penitentiary in Lompoc, California.  He is serving a life sentence without the option of parole and has been classified as a high security inmate for approximately twenty-year.   His conviction originated in Memphis, Tennessee and his family is located in Washington, D.C.  Due to Mr. Calloway's length of sentence, classification and location of his family, he is at high risk of being transferred to USP Letcher.  Mr. Calloway would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

23.

Plaintiff David Cilla is currently housed at the United States Penitentiary near Jonesville, Virginia.  He is serving a fifteen-year sentence and has been classified as a high security inmate for approximately four years.  His conviction originated in Ft. Lauderdale, Florida and his family is located in Florida and Tennessee.  Due to Mr. Cilla's length of sentence, classification and location of his family, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built.  Mr. Cilla would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

24.

Plaintiff Corvain Cooper is currently housed at the United States Penitentiary in Pollock, Louisiana.  He is serving a life sentence for non-violent marijuana related offenses, and is classified as a high security inmate because of his sentence.  His sentence originated

in North Carolina, his family is located in California, yet he is housed in a penitentiary in Louisiana.   Due to Mr. Cooper's length of sentence, classification and location of his family, he is at high risk of being transferred to USP Letcher should it be built. Mr. Cooper would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

25.

Plaintiff Manuel Gauna is currently housed at the Federal Correctional Institute in Mendota, California.  He is serving a twenty-year sentence and is currently classified as a medium security inmate.  The BOP has housed Mr. Gauna in the Mid-Atlantic region in the past. Due to Mr. Gauna's length of sentence and classification, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built. Mr. Gauna would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

26.

Plaintiff Christopher Grief is currently housed at the Federal Satellite Low in Lisbon, Ohio.  He is serving an eight-year sentence and is currently classified as a low security inmate.  Due to Mr. Grief's length of sentence and classification, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built. Mr. Grief would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all

pertinent documents were not made available in the law libraries of the facilities where he
has been housed.

27.

Plaintiff Jeremy Hammond is currently housed at the Federal Correctional
Institution in Milan, Michigan.  He is serving a ten-year sentence and is currently classified
as a low security inmate.  His conviction originated in the Southern District of New York.
The BOP has housed Mr. Hammond in facilities in the Mid-Atlantic Region in the past.
Due to Mr. Hammond's length of sentence and classification, he is at high risk of being
transferred to USP Letcher or its satellite camp should it be built.  Mr. Hammond would
have participated in the public comment periods related to BOP's proposed action to build
USP Letcher, however, notice of these public comment periods and a hard copy of all
pertinent documents were not made available in the law libraries of the facilities where he
has been housed.

28.

Plaintiff George Jefferson, III is currently housed at the Federal Correctional
Institute in Butner, North Carolina.  He is serving a twenty-year sentence and is currently
classified as a medium/high security inmate.  His conviction originated in North Carolina,
where his family is located.  The BOP has housed Mr. Jefferson in facilities in the Mid-
Atlantic Region in the past.  Due to Mr. Jefferson's length of sentence, classification and
his family's location, he is at high risk of being transferred to USP Letcher or its satellite
camp should it be built. Mr. Jefferson would have participated in the public comment
periods related to BOP's proposed action to build USP Letcher, however, notice of these
public comment periods and a hard copy of all pertinent documents were not made
available in the law libraries of the facilities where he has been housed.

29.

Plaintiff Mark Jordan is currently housed at the United States Penitentiary in Tucson, Arizona. He is serving a sixty-one and a half year sentence and is currently classified as a high security inmate. His conviction originated in Pennsylvania, where his family is located. He does not receive family visits due to extreme distance between his family and his current facility. Due to Mr. Jordan's length of sentence, classification and his family's location, he is at high risk of being transferred to USP Letcher should it be built. Mr. Jordan would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

30.

Plaintiff Brent Lovett is currently housed at the Federal Prison Camp in Florence, Colorado. He is serving ninety-eight month sentence and is currently classified as a low security inmate. His conviction originated in Nevada, where is family is located. Mr. Lovett would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

31.

Plaintiff Jeremy Mack is currently housed at the Penitentiary in Sumterville, California. He is serving a life sentence and is currently classified as a high security inmate. His conviction originated in Ohio, which is where his family is located. The BOP has housed Mr. Mack in the Mid-Atlantic region in the past. Due to where his family lives,

his sentence and his classification, Mr. Mack is at great risk of being transported to USP Letcher should it be built.  Mr. Mack would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

32.

Plaintiff James Mitchell is currently housed at the Federal Correctional Institute in Seagoville, Texas.  He is serving eleven and a half year sentence and is currently classified as a low security inmate.  His conviction originated in Arkansas.  Due to Mr. Mitchell's sentence and his classification, Mr. Mitchell is at great risk of being transported to USP Letcher or its satellite camp should it be built.  Mr. Mitchell would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

33.

Plaintiff Ronald Myers is currently housed at the Federal Correctional Institute in Phoenix, Arizona.  He is serving a thirty-year sentence and is currently classified as a medium security inmate.  His family lives in Nevada and can only visit about one time per year due to the distance between them and the facilities where the BOP has housed Mr. Myers.  Due to Mr. Myer's length of sentence and classification, he is at high risk of being transferred to USP Letcher or its satellite camp should it be built. Mr. Myers would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been

housed.

34.

Plaintiff Jason Palacios is currently housed at the Penitentiary in Atwater, California.  He is serving a life sentence and is currently classified as a high security inmate.  His conviction originated in New York, which is where his family is located.  Mr. Palacios' family has a hard time visiting him due to the distance between them.  Due to where his family lives, his sentence and his classification, Mr. Palacios is at great risk of being transported to USP Letcher should it be built.  Mr. Palacios would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

35.

Plaintiff Scott Petrie is currently housed at the Federal Penitentiary in Yazoo City, Mississippi.  He is serving a forty-two year sentence and is currently classified as a high security inmate.  His conviction originated in New York, where his family is located.  He does not receive family visits due to extreme distance between his family and his current facility.  Due to Mr. Petrie's length of sentence, classification and his family's location, he is at high risk of being transferred to USP Letcher should it be built. Mr. Petrie would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

36.

Plaintiff Joseph Rector is currently housed at the United States Penitentiary in Tucson, Arizona.  He is serving a one hundred and ten year sentence and is currently classified as a high security inmate.  His conviction originated in Arkansas and his family is located in Arkansas and Oklahoma.  The BOP has housed Mr. Rector in the Mid-Atlantic region in the past.  Due to Mr. Rector's sentence and classification, he is at high risk of being transferred to USP Letcher should it be built.  Mr. Rector would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

37.

Plaintiff Vernon Reid is currently housed at the Federal Correctional Institute in Gilmer, West Virginia.  He is serving a ten-year sentence and is currently classified as a medium security inmate.  His conviction originated in Georgia, where his family is located. He does not receive family visits at his current location due to extreme distance between his family and his current facility.  Due to Mr. Reid's length of sentence, classification and his family's location, he is at high risk of being transferred to USP Letcher should it be built. Mr. Reid would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

38.

Plaintiff David Rostan is currently housed at the Federal Penitentiary in Yazoo City, Mississippi.  He is serving a life sentence and is currently classified as a medium security

inmate. His conviction originated in Florida, but he has been housed in high-security facilities in the Mid-Atlantic region. Due to Mr. Rostan's length of sentence and classification, he is at high risk of being transferred to USP Letcher should it be built. Mr. Rostan would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

39.

Plaintiff Michael Schuttpelz is currently housed at the Penitentiary in Marion, Illinois. He is serving a thirty-eight year sentence and is currently classified as a medium security inmate. His conviction originated in Michigan and his family is located in Iowa. Due to his sentence and classification, Mr. Schuttpelz is at risk of being transferred either to USP Letcher or its satellite camp should they be built. Mr. Schuttpelz would have participated in the public comment periods related to BOP's proposed action to build USP Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

40.

Plaintiff Connor Stevens is currently housed at the Federal Correctional Institute in Jesup, Georgia. He is serving a 97-month sentence and will be on probation/parole for the remainder of his life. His conviction originated in Ohio, which is where his family is located. Due to his sentence and classification, Mr. Stevens is at risk of being transferred either to USP Letcher or its satellite camp should they be built. Mr. Stevens would have participated in the public comment periods related to BOP's proposed action to build USP

Letcher, however, notice of these public comment periods and a hard copy of all pertinent documents were not made available in the law libraries of the facilities where he has been housed.

41.

The above-listed incarcerated Plaintiffs have exhausted all administrative remedies available to them as required by the Prison Litigation Reform Act and the National Environmental Protection Act.

42.

Plaintiff Abolitionist Law Center ("ALC") is a public interest law firm organized for the purpose of abolishing class and race based mass incarceration in the United States. To accomplish this goal, the Abolitionist Law Center engages in litigation on behalf of people whose human rights have been violated in prison, and develops and supports grassroots organizing against mass incarceration. ALC has participated in every NEPA public comment period related to BOP's proposed prison in Letcher County, Kentucky.

43.

As an organization, ALC has devoted significant economic resources to issues related to the intersection of environmental justice and prison reform. Specifically, ALC works to raise awareness and oppose the construction and maintenance of prisons at sites that present significant environmental and public health risks to inmates and their families, and the corrections officers that work in these facilities. These resources include not only money, but also the many hours in volunteer time and effort expended by ALC staff and its supporters.

44.

The relief sought by the Plaintiffs in this action would remedy the injuries that they have each suffered.

45.

Defendant BOP is an agency of the United States government.  Its website states its purpose is to "protect public safety by ensuring that federal offenders serve their sentences of imprisonment in facilities that are safe, humane, cost-efficient, and appropriately secure, and provide reentry programming to ensure their successful return to the community."

46.

Defendant Hugh Hurwitz is the Acting Director of the BOP.  He oversees and manages the agency's operations and facilities.  Defendant Hurwitz's responsibilities include making NEPA-related decisions and the siting of future facilities.

## STATUTORY AND REGULATORY BACKGROUND

47.

### THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It makes environmental protection a part of the mandate of every federal agency. 42 U.S.C. § 4332(1).

48.

NEPA seeks to ensure that federal agencies take a "hard look" at environmental concerns. One of NEPA's primary purposes is to ensure that an agency, "'in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts.'" *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989).

49.

17

NEPA regulations define significant impacts with the following definition: "*Significantly* as used in NEPA requires considerations of both context and intensity: (a) Context. *This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), **the affected region, the affected interests, and the locality.*** Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant. *See* 40 C.F.R. § 1508.27 (emphasis added).

50.

NEPA regulations require an EIS to  "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 CFR 1502.13.  "[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Citizens against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C. Cir. 1990).

51.

"The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in [NEPA] are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. As such, an EIS must "provide full and fair discussion of significant environmental impacts and [must] inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1.

52.

18

The "human environment" to be analyzed "shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. . . . When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment." *Id.* § 1508.14.

53.

Accordingly, an EIS must analyze: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C).

54.

NEPA requires that an EIS contain a thorough discussion of the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii), (E). The discussion of alternatives is "the heart" of the NEPA process, and is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(C)(iii), (E). The agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). As such, "[a]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C. Cir.1991) (citation omitted).

55.

Executive Order 12,898 also requires federal agencies to include an environmental justice analysis in their NEPA reviews.  Like other components of an EIS, an environmental justice analysis must be "reasonable and adequately explained," *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689, 359 U.S. App. D.C. 383 (D.C. Cir. 2004).

56.

NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the public, "that may also play a role in the decision making process and the implementation of the decision." *Id.* NEPA's implementing regulations require federal agencies to "invite the participation" of "interested persons" during its scoping process. 40 C.F.R. § 1501.7(a)(1).

57.

NEPA requires agencies to fully disclose all of the potential adverse environmental impacts of its decisions before deciding to proceed. 42 U.S.C. § 4332(C). NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

58.

After preparing an EIS, but before finalizing an EIS, the federal agency is legally required "request comments from the public" and must affirmatively solicit "comments from those persons or organizations who may be interested or affected." 40 C.F.R. § 1503.1(a)(2)-(4).

59.

NEPA's governing regulations define what "range of actions, alternatives, and impacts [must] be considered in an environmental impact statement." 40 C.F.R. § 1508.25.

This is in part what is known as the "scope" of the EIS. The EIS must consider direct and indirect effects. The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

60.

The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

61.

An agency must also analyze and address the cumulative impacts of a proposed project. 40 C.F.R. § 1508.25(c)(3). Cumulative impacts are the result of any past, present, or future actions that are reasonably certain to occur. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

62.

**ADMINISTRATIVE PROCEDURE ACT**

The Administrative Procedure Act ("APA") establishes the default rules for federal administrative law. 5 U.S.C. § 551 *et seq*. The APA authorizes judicial review of final agency actions and provides a private right of action for "a person suffering a legal wrong because of agency action." *Id*. § 702.

63.

A court can set aside an agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making decisions, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the

choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)(internal citations omitted).

64.

A reviewing court will find an agency decision to be arbitrary and capricious if the agency relied on factors which Congress did not intend it to consider; the agency entirely failed to consider an important aspect of the problem; the agency offered an explanation for its decision that runs counter to the evidence before the agency; or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id*.

65.

"In order for an agency decision [pursuant to NEPA] to pass muster under the APA's 'arbitrary and capricious' test the reviewing court must determine that the decision 'makes sense.' Only by 'carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision' can the court 'ensure that agency decisions are founded on a reasoned evaluation of the relevant factors.'" *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1285 (1st Cir. 1996) (internal citations omitted). In *Dubois*, the court found that the Forest Service acted arbitrarily and capriciously when it had not "rigorously explored all reasonable alternatives," including the one put forward by an environmental organization. *Id.* at 1288.

66.

**BOP POLICY**

BOP policy requires that "Federal Register documents . . . pertaining to the Bureau and to the U.S. Parole Commission are to be maintained in the institution's inmates law libraries.  Maintaining these documents in the inmate law libraries is intended to ensure that

22

inmates have the opportunity to participate in the rulemaking process." *See* U.S. Department of Justice, Program Statement No. 1315.07 § 9 (Attached as Exhibit 1).

## FACTUAL ALLEGATIONS

67.

**A.      BOP's Failure to Comply with NEPA's Public Notice and Involvement Requirements**

The BOP first notified the public about its intention to build a USP Letcher, and an accompanying Federal Prison Camp ("FPC") on July 26, 2013 when it published in the Federal Register a Notice of Intent to Prepare a Draft Environmental Impact Statement for USP Letcher.  This notice indicated that the BOP was opening a 30-day public scoping period that included a public Scoping Meeting at Letcher County Central High School.  The scoping meeting and period provided the public with the opportunity to submit comments about the agency's proposed action.

68.

This Federal Register publication was not made available in any of the inmate law libraries where the Plaintiffs were housed at the time of publication.

69.

On February 10, 2015, the BOP published in the Federal Register that on February 13, 2015, it would be making its Draft Environmental Impact Statement ("DEIS") available for the public to review.  It also indicated that February 13, 2015 would open a 45-day period so that the public could submit comments concerning the DEIS' content.

70.

The BOP made a hard copy of the entire DEIS available in public libraries throughout Letcher County so that individuals without access to an online version could still have access to review it.

23

71.

The February 10, 2015 Federal Register Notice was not made available in any of the inmate law libraries where the Plaintiffs were housed at the time of publication.

72.

The BOP did not make the DEIS available in any of its inmate law libraries so that inmates such as the Plaintiffs could review it and submit comments to the BOP.

73.

In July of 2015, the BOP published its first final EIS and accepted comments concerning its content for a thirty-day window within which the public could submit comments to be considered by the Bureau prior to and in connection with a Record of Decision ("ROD") for the proposed action. The BOP did not make the FEIS available to any of its inmate law libraries so that the inmates like the Plaintiffs could review it and submit comments to the BOP.

74.

The BOP withdrew the July 2015 Final EIS after consideration of comments received following its publication and to correct inconsistencies in the Final EIS. As a result of comments received following release of the Final EIS, the Bureau concluded that written notice of availability of the Final EIS had not been directly provided to at least 22 parties who had requested it.

75.

In March 2016, the BOP then published a Revised FEIS and opened another 30-day window for the public to comment about for consideration prior to the issuance of any ROD.  The BOP did not make the RFEIS available to any of its inmate law libraries so that the inmates like the Plaintiffs could review it and submit comments to the BOP.

76.

On March 24, 2017, the BOP published a Draft Supplemental Revised Final Environmental Impact Statement (DSRFEIS), and opened up a 45-day period for the public to provide comment to the BOP about the content of the document.   Notice of the public comment period was published in the Federal Register.  The BOP made a hard copy of the entire DSRFEIS available in public libraries throughout Letcher County so that individuals without access to an online version could still have access to review it.

77.

The BOP did not make a copy of the Federal Register notice about the March-May 2017 public comment period or the DSRFEIS available to any of its inmate law libraries so that the inmates like the Plaintiffs could review it and submit comments to the BOP.

78.

In September of 2017, the BOP published its FSREIS and opened another 30-day window for the public to comments about for consideration prior to the issuance of any ROD.  The BOP did not make the RFEIS available to any of its inmate law libraries so that the inmates like the Plaintiffs could review it and submit comments to the BOP.

79.

On March 30, 2018, the BOP published a Record of Decision ("ROD") describing its rationale for selecting a site and moving forward with the construction of USP Letcher. The BOP did not make the ROD available to the Plaintiffs or any other inmates in its custody and control.

80.

Whenever the BOP opened a public comment period related to USP Letcher, several commenters, including the Abolitionist Law Center, raised concerns that various iterations

of the EIS had not been made available to inmates in the custody of the BOP.  The BOP

repeatedly ignored these comments concerning this issue, and never properly notified

inmates in its custody about the EIS or the public comment period for USP Letcher.

81.

**B.     Plaintiffs' Interests In Participating in the NEPA Process for USP Letcher**

The Plaintiffs, with the exception of ALC, are all currently incarcerated under the

custody and control of the Defendant BOP.  The Plaintiffs are located in BOP facilities

across the United States and represent each of BOP's classification security levels – with

the exception of those housed in administrative segregation.

82.

The incarcerated Plaintiffs are all at risk of being transported to USP Letcher should

it be completed, and therefore have a legitimate interest in participating in the NEPA public

decision-making process and its outcome.  Should BOP build USP Letcher, inmates housed

in the facility will 1) face health risks from the surrounding environment; and 2) receive

less visits from attorneys, family and friends due to the isolated nature of the selected site.

83.

Despite these direct interests in BOP's proposed action, none of the facilities where

the Plaintiffs have been housed posted in the inmate law library any of the federal register

notices related to BOP Letcher.  In addition, none of the facilities where the Plaintiffs have

been housed provided a copy of the Draft EIS, the FEIS, the RFEIS, the DSRFEIS or the

SRFEIS (hereinafter "BOP's NEPA documents").

84.

The incarcerated Plaintiffs all would have provided substantive and meaningful

comments to the BOP, had they received notice of the public comment period and had

access to the NEPA documents.  By not notifying and providing its inmate population with access to the NEPA documents, BOP effectively violated the incarcerated Plaintiff's statutory rights to participate in NEPA's mandatory public commenting process.

85.

ALC works to stop the construction and maintenance of prisons at environmentally unsound sites that compromise the health of inmates, their families, and the correctional officers that work there.  BOP's proposal to build USP Letcher atop a former MTR site, in the heart of coal-country presents a serious risk to violate the rights of those that ALC works to protect.  ALC has participated in every public comment period available to it during the course of BOP's development of the EIS and its supplemental documents.

**C.      Facts Relevant to Plaintiff's Claims**

**i.      General Background on Economic and Public Health Concerns with Prison Construction in Appalachia**

As proposed, the BOP intends to build USP Letcher atop a former coal mine in the small rural hamlet of Roxana, Kentucky.  This decision comes on the backend of a prison construction boom in the Appalachian region, promising that constructing prisons would mend the economic hardships of the area.  Now the region hosts twenty-nine state and federal prisons.  In just eastern Kentucky alone, the BOP has built 3 prisons since 1992.

86.

Development indicators reviewed by Dr. Deborah Tootle, however, all point to the conclusion that prisons "appear to have a negligible, or perhaps negative impact on economic development in rural communities."  Appalachia's experience reflects this national trend.  Prison growth has expanded rapidly, yet growth of this sector has not contributed to economic development. For instance, Appalachian State University Professor, Dr. Robert Perdue's 2016 study found that

prison counties in Central Appalachia have lower per capita income and higher poverty rates than counties without a prison. On the other hand, our analysis seems to support the claims that prisons can create jobs, as we find that prison counties have lower rates of unemployment than counties without a prison. Combined with the negative income and poverty findings, however, it appears likely that these are not the higher-paying management and correctional positions that would boost local economies. As noted earlier, other researchers have found that the "good" jobs typically go to those from outside the area who have the training and skills necessary to fill these positions. *In short, while jobs may be created to serve the industry, they are likely to be low-paying and to lack benefits.*

87.

Beyond questionable economic benefits that USP Letcher could provide, BOP's selection of a new prison in the heart of Appalachia's coal country presents serious potential health impacts for inmates, correctional officers and prison staff of the proposed prison.  Scientific literature and past events in region demonstrate that there are unquestionable health risks from living within the close proximity of coal mines.

88.

For example, The *American Journal of Public Health* published a study in 2011 that found that even after controlling for socioeconomic factors, residents of counties with mountaintop removal mining in Appalachia communities suffered significantly higher rates of poor physical and mental health than other Appalachian communities.

89.

Another study published in the *Journal of Rural Health* in 2011 concluded that chronic cardiovascular disease mortality is more prevalent in mountaintop removal areas.

90.

A 2011 water-quality study published in the *Proceedings of the National Academy of Sciences* found increased concentrations of selenium, sulfate, magnesium and other inorganic solutes in rivers downstream from active and reclaimed mining sites.

91.

The *Journal of Geospatial Health* published a 2010 study found that even after controlling for cigarette smoking, cancer mortality rates increased for residents who lived near mining operations in West Virginia.

92.

It is undisputed that there are five active coal mines in proximity to the Roxana site, all of which are within the North Fork River Watershed. In fact, as demonstrated by the below graphic, at least one active coal mine operates just down the road from the Roxana site where BOP wishes to build its prison.



Proposed BOP Prison Site in Roxana, Ky.     Active Coal Mining Operation     Coal Slurry Pond

29

93.

Considering the well-documented public health risks associated with coal mining and processing, the industry's prevalence in the area immediately surrounding the proposed prison should be a significant concern.

94.

### ii.   BOP Failed to Meet NEPA's Public Notice Requirements

The BOP failed to notify inmates currently incarcerated and in the custody and control of the agency about its proposed activities in Letcher County.   NEPA's implementing regulations require the BOP to "invite the participation" of "interested persons" during its scoping process. After preparing its draft EIS and before finalizing the document, the BOP is legally required "request comments from the public" and must affirmatively solicit "comments from those persons or organizations who may be interested or affected."

95.

BOP's own internal policies, as articulated by Program Statement No. 1315.07 § 9, require that "Federal Register documents . . . pertaining to the Bureau and to the U.S. Parole Commission are to be maintained in the institution's inmates law libraries. Maintaining these documents in the inmate law libraries is intended to ensure that inmates have the opportunity to participate in the rulemaking process."

96.

The incarcerated plaintiffs are members of the social sector that will be profoundly impacted by this particular agency action, as they face the risk of being relocated against their will to the new facility at USP Letcher.  Consequently, they are the most likely to face adverse health risks from living atop of a former mining site in a region plagued by unsafe drinking water and widespread environmental pollution.

97.

NEPA and BOP's regulations required the agency to take affirmative steps in notifying the Plaintiffs and other federal inmates about its proposed action in Roxana, Kentucky for each and every public comment period, and also provided them via inmate law libraries with copies of the all of the relevant NEPA documents.

98.

Just as the agency provided hard copies of the register notice and its EIS documents in Letcher County public libraries, the agency could have complied with this essential procedural and democratic notice requirement of NEPA by placing the Register Notice and a copy of it's EIS documents in the law libraries of its facilities.

99.

The incarcerated plaintiffs are an "affected group" recognized by NEPA that should have been invited into the BOP's scoping process and commenting period.  Denying the Plaintiffs and other similarly situated inmates the opportunity to meaningfully participate in the NEPA process related to the construction of USP Letcher contravenes the democratic principles of NEPA.

100.

The incarcerated plaintiffs did not have access to any of BOP's NEPA related documents for its proposed action in Letcher County, Kentucky.  There was no notice from the federal register posted in any of their facilities' law libraries about any public comment period related to BOP's proposed action in Letcher County, Kentucky.  As individuals with an interest in BOP's proposed activity, the incarcerated plaintiffs would have provided substantive and meaningful comments to the BOP during BOP's scoping sessions and its public comment periods.

31

101.

### iii.     The BOP's Stated Purpose and Need for the Proposed Action Is Inaccurate and Unjustified.

In it's ROD, the BOP reiterated that the stated purpose and need for USP Letcher is to develop additional high-security facilities to increase capacity for current inmate populations in the Mid-Atlantic Region based on the need for additional bed space. The ROD specifically states that

> The Bureau has studied the need for an additional high-security penitentiary and an associated federal prison camp in the Mid-Atlantic Region, and has continually updated inmate population totals throughout the EIS process. The overall prisoner population is declining. On June 13, 2017, the

> U.S. Department of Justice Deputy Attorney General testified before the House Committee on Appropriations that the federal inmate population has declined 14 percent, totaling 30,000 inmates, over the last four years. Although the inmate population has been declining in recent years, as of November 28, 2017, the size of the total inmate population in the Bureau's institutions exceeds the rated capacity of its prisons by 14 percent, with its high-security level institutions (USPs) at an approximate 29 percent overcrowded rate. Based on recent U.S. Department of Justice policy changes in prosecution priorities, the Bureau's Fiscal Year 2018 total inmate population is projected to increase to approximately a 16 percent overcrowded rate, and high-security level institutions population is projected to remain at 29 percent overcrowded.

> There is a continuing need for additional high-security male facilities in the Mid-Atlantic Region, where every existing high-security male facility has been operating, and continues to operate, above its rated capacity. As of November 28, 2017, the four high-security male facilities in this region housed approximately 4,797 high-security male inmates, but their total rated capacity is 3,441 inmates. Therefore, the Bureau has determined the Mid-Atlantic Region high-security male facilities are overcrowded and exceed rated capacity by 39 percent.

> Overcrowding in the Mid-Atlantic Region facilities compromises the mission of the Bureau. The Bureau faces challenges in providing for inmates' care and safety in crowded conditions, as well as the safety of Bureau staff and surrounding communities, within budgeted levels. Provision of a new USP and FPC with additional high-security bed space in Letcher County would meet the need to ensure a safe and secure environment for both staff and inmates, particularly as it applies to higher security inmates, within the Mid-Atlantic Region, afford the Bureau continued management of inmates originating from the region, allowing those inmates to remain close to family, which aids in the rehabilitation process.

102.

However, the BOP's purported purpose and need for USP Letcher does not align with actual and current inmate population trends because it was developed based on BOP's figures from 2005. In the agency's 2017 annual budget submission to Congress, the BOP confirmed that the Alternatives Analysis for whether or not to build USP Letcher was in fact completed in November 2005. That 2005 analysis found that "[c]onstructing a new facility was the alternative determined to provide the greatest benefit to taxpayers and ultimately be more cost effective than the other alternatives." The BOP has made this statement to Congress in every annual budget submission that is publicly available, going back to 2012.

103.

When the BOP completed its "Alternatives Analysis" for USP Letcher in 2005, it had only 102 facilities with a rated capacity of 106,732. The BOP confined 145,780 people in 2005, and its facilities were 37 percent over-capacity. As of August 11, 2018, the BOP incarcerates 154,818 people. The BOP's FY 2018 annual budget submission to Congress estimated that its facilities would be 15 percent overcrowded, but that number was based on a projected 2018 prison population of 156,256 inmates.

104.

Since its determination in November 2005 that building a new prison in Letcher County was the best means of managing its population, the BOP has built at least 20 new prisons and increased its overall capacity by at least 28,559 prisoners. On the other hand, the BOP only incarcerates 9,038 more people in 2018 than it did in 2005. Overall, the federal prison population has declined by more than 30,000 prisoners since its peak in 2013, and the overcapacity rate has fallen from 37 percent to 12 percent in 2017.

105.

In addition, the BOP has announced that it is opening a new special management unit at AUSP Thomson.   The BOP's webpage indicates that the agency is moving "the Special Management Unit (SMU) (a program for high security inmates) from the United States Penitentiary (USP) Lewisburg, to AUSP Thomson."   USP Lewisburg is in the Northeast Region and houses approximately 660 high-security inmates even though it has rated capacity for 931 inmates.   While USP Lewisburg is in BOP's Northeast Region, its Pennsylvania location puts it in a state adjacent to the Mid-Atlantic Region.   Transferring approximately 930 inmates from the Mid-Atlantic Region to the USP Lewisburg following that facility's transfer of inmates to AUSP Thomson would nearly solve the BOP's alleged Mid-Atlantic's overpopulation issue.

106.

The ROD states that

Although the inmate population has been declining in recent years, as of November 28, 2017, the size of the total inmate population in the Bureau's institutions exceeds the rated capacity of its prisons by 14 percent, with its high-security level institutions (USPs) at an approximate 29 percent overcrowded rate. Based on recent U.S. Department of Justice policy changes in prosecution priorities, the Bureau's Fiscal Year 2018 total inmate population is projected to increase to approximately a 16 percent overcrowded rate, and high-security level institutions population is projected to remain at 29 percent overcrowded. There is a continuing need for additional high-security male facilities in the Mid-Atlantic Region, where every existing high-security male facility has been operating, and continues to operate, above its rated capacity. As of November 28, 2017, **the four high-security male facilities in this region housed approximately 4,797 high-security male inmates, but their total rated capacity is 3,441 inmates.** Therefore, the Bureau has determined the Mid-Atlantic Region high-security male facilities are overcrowded and exceed rated capacity by 39 percent.

107.

Despite BOP projections of a population increase, the trend of **decreasing** population numbers of high-security prisoners continues in the Mid-Atlantic Region USPs. For example, the FEIS published in July 2015 stated that the combined high-security population for USPs Hazelton, Lee, Big Sandy and McCreary was 5,802 people. In

contrast, the combined population cited in the DSEIS published in March 2017 was 5,118, which further fell to 5,029 in the most recent FSREIS.   BOP's ROD reports that in November 2017, the population of high-security inmates in the Mid-Atlantic region was 4,797.

108.

The July 2015 FEIS stated that the total rated capacity for these USPs was 3,400 prisoners, but the FRSEIS indicates that this capacity had risen to 3,821. The BOP however does not indicate how it determines this "rated capacity" figure.  A review of Prison Rape Elimination Act ("PREA") reports would indicate that these facilities actually have a higher capacity than what the BOP represented in its NEPA documents:

| BOP FACILITY | LISTED PREA CAPACITY | FRSEIS LISTED CAPACITY |
|---|---|---|
| USP Hazelton | 960 inmates | 957 inmates |
| USP Lee | 1451 inmates | 960 inmates |
| USP Big Sandy | 949 inmates | 949 inmates |
| USP McCreary | 1500 inmates | 955 inmates |
| **TOTAL** | **4,860 inmates** | **3,821 inmates** |

109.

BOP Program Statement 1060.11 defines the difference between "rated capacity" and "total capacity:"

    a.   Rated Capacity means an institution's total capacity less hospital/infirmary, administrative detention, and disciplinary segregation.  (The medical bedspace at the medical referral centers is to be included in the rated capacity for these institutions).  Rated capacity is not necessarily the same as any institution's design or operating capacity.  It is the objective measurement of inmate housing space without regard to items such as institution age, location, or infrastructure.

    b.   Total Capacity means an institution's rated capacity plus the capacity of housing used for medical and special housing purposes.   This includes administrative detention and disciplinary segregation.

110.

Understanding these determinations is essential; however, the BOP absolutely failed to account for how it determined its overcapacity figures presented to the public in its NEPA documents.  For instance, McCreary is currently housing 1,165 inmates.  However, if some of those inmates are actually being housed in a hospital, administrative or disciplinary segregation then it is absolutely feasible that this facility is actually running at or below its rated capacity.  The same could be true for the remaining three USPs in the Mid-Atlantic region.

111.

In fact, when assessing the population numbers of BOP's high-security facilities within the perspective of total capacity in comparison to its rated capacity, the Mid-Atlantic region's population **is actually less than** the purported bed-space in those very institution's PREA reports.

112.

By not appropriately accounting for the manner in which an inmate is housed (ie administrative segregation v. general population) when determining its facilities' population numbers, the BOP cannot actually determine whether its purported "purpose and need" for this facility is accurate.

113.

The BOP had access to all of this information prior to rendering its ROD in this matter.  In addition, several comments submitted to the agency during the NEPA public comment periods addressed this discrepancy.  Nevertheless, the BOP, as evidenced by its ROD, continues to assert what seems to be an overpopulation myth to push through approval of building USP Letcher.

114.

### a. There is no need for a federal prison camp

The ROD's stated "purpose and need" solely focuses on BOP's need for the high security facility at USP Letcher.  It totally fails to account for the "purpose and need" to also build a federal prison camp.

### 115.

BOP's NEPA documents indicate that USP Letcher's federal prison camp (FPC) would incarcerate 256 minimum-security prisoners.  The planned FPC facility would cover 65,262 square feet, and would contribute to all the negative environmental impacts associated with the larger project. None of the BOP's NEPA documents have addressed why the agency needs to build this minimum-security facility or how doing so would achieve its "Purpose and Need" of reducing overcrowding in Mid-Atlantic Region high-security prisons.   The BOP's NEPA documents also failed to discuss whether the minimum-security facilities in the Mid-Atlantic region are operating at capacity or not.

### 116.

Prison Rape Elimination Act (PREA) Audits and Reports from 2018 compared to current figures displayed on BOP's webpage demonstrate that in fact the Mid-Atlantic region is not operating at capacity for its minimum security inmates.[1]

| FCI Morgantown, Morgantown, West Virginia | |
|---|---|
| capacity | 1,305 inmates |
| current population | 941 inmates |
| | **under capacity by 364 inmates** |

| Big Sandy Satellite Camp, Inez, Kentucky | |
|---|---|
| capacity | 128 inmates |
| current population | 86 inmates |
| | **under capacity by 42 inmates** |

---

[1] The Abolitionist Law Center submitted similar statistics in its October 28, 2017 comment to the BOP on its Final Supplemental Revised Environment Impact Statement.  The statistics have been updated to reflect those completed 2018 PREA reports and BOP facility populations as of November 20, 2018.

| **Hazelton Satellite Camp, Bruceton Mills, WV** | |
|---|---|
| capacity | 128 inmates |
| current population | 118 inmates |
| | **under capacity by 10 inmates** |

| **Lee Satellite Camp, Pennington Gap, Virginia** | |
|---|---|
| capacity | 110 inmates |
| current population | 96 inmates |
| | **under capacity by 14 inmates** |

| **McCreary Satellite Camp, Pine Knot, KY** | |
|---|---|
| capacity | 149 inmates |
| current population | 137 inmates |
| | **under capacity by 12 inmates** |

117.

A review of this data indicates that at the current date, in the Mid-Atlantic region, the BOP has capacity for **an additional 442 minimum-security inmates in this region**. This number has increased since the closing of the last NEPA public comment period on October 28, 2017.

118.

A review of the current data for minimum-security facilities across the BOP shows a similar result in that the agency does not have an over-capacity issue for this particular classification of inmate:

| **FPC Duluth, Duluth, Minnesota** | |
|---|---|
| capacity | 881 inmates |
| current population | 609 inmates |
| | **under capacity by 272 inmates** |

| **FPC Montgomery, Montgomery, Alabama** | |
|---|---|
| capacity | 920 inmates |
| current population | 854 inmates |
| | **under capacity by 66 inmates** |

| **FPC Pensacola, Pensacola, Florida** | |
|---|---|

| capacity | 708 inmates |
|---|---|
| current population | 594 inmates |
| | **under capacity by 114 inmates** |

| **FPC Yankton, Yankton, South Dakota** | |
|---|---|
| capacity | 684 inmates |
| current population | 529 inmates |
| | **under capacity by 155 inmates** |

| **Atwater Satellite Camp, Atwater, California** | |
|---|---|
| capacity | 119 inmates |
| current population | 114 inmates |
| | **under capacity by 5 inmates** |

| **Beaumont Satellite Camp, Beaumont, Texas** | |
|---|---|
| capacity | 512 inmates |
| current population | 556 inmates |
| | **over capacity 60 inmates** |

| **Canaan Satellite Camp, Waymart, PA** | |
|---|---|
| capacity | 130 inmates |
| current population | 122 inmates |
| | **under capacity 8 inmates** |

| **Florence Prison Camp, Florence, Colorado** | |
|---|---|
| capacity | 590 inmates |
| current population | 484 inmates |
| | **under capacity by 106 inmates** |

| **FPC Pollock, Pollock, Louisiana** | |
|---|---|
| capacity | 256 inmates |
| current population | 253 inmates |
| | **under capacity by 3 inmates** |

| **FPC Terra Haute, Terra Haute, Indiana** | |
|---|---|
| capacity | 324 inmates |
| current population | 358 inmates |
| | **over capacity by 34 inmates** |

| **FPC Tucson, Tucson, Arizona** | |
|---|---|
| capacity | 128 inmates |
| current population | 148 inmates |
| | **over capacity by 20 inmates** |

| FPC Victorville, Victorville, California | |
|---|---|
| capacity | 256 inmates |
| current population | 288 inmates |
| | **over capacity by 32 inmates** |

| FPC Yazoo City, Yazoo City, Mississippi | |
|---|---|
| capacity | 324 inmates |
| current population | 290 inmates |
| | **under capacity by 34 inmates** |
| **FCI Allenwood, Allenwood, PA** | |
| capacity | 1326 inmates |
| current population | 1255 inmates |
| | **under capacity by 71 inmates** |

119.

Overall, the BOP has capacity to approximately accommodate **an additional 688 inmates** classified as minimum-security.  Consequently, the lack of any analysis in the BOP NEPA documents related to the satellite camp that BOP wants to build is because there is no actual need for such a facility.

120.

The BOP had access to the population statistics at all of its low security facilities when it developed its NEPA documents and published its ROD.  Nevertheless, the agency failed to account for the purpose and need of its proposed action to build a new federal prison camp in Roxana, Kentucky.

121.

**b.      The Department of Justice's FY2018 and Sworn Testimony to Congress Indicate that there is no purpose and need for USP Letcher**

The United States Department of Justice (DOJ), FY2018 Performance Budget on FY 2018 specifically calls for the rescission of the $444 million previously appropriated in FY2016 to build the proposed USP in Letcher County. Pertinent sections of this document describe why rescission is important:

Description of Item: The budget proposes to rescind $444,000,000 in unobligated New Construction balances originally appropriated in FY 2016 for the construction of a facility in Letcher County, KY. This proposal will result in stoppage of any major site work, preliminary project work and/or planned contract activities for this construction project.

Justification: For FY 2018, the budget proposes a rescission of $444,000,000 in unobligated prison construction balances. Rather than investing in new construction, the budget includes funding to expand prison capacity in more efficient and cost-effective ways. In Salaries and Expenses, $80 million is requested to activate the Thomson, IL facility, which would provide additional capacity to reduce crowding without the need for new construction. In addition, the BOP is able to leverage contracts with private facilities to house additional inmates, particularly at the low-security level.

122.

On June 13, 2017, the Department of Justice ("DOJ"), Deputy Attorney General, Mr. Rod Rosenstein also gave sworn testimony to the House of Representatives Committee on Appropriations supporting DOJ's position that there is no need for its subagency (BOP) to build a USP in Letcher County. At that hearing, Deputy A.G. Rosenstein stated:

the FBOP population has precipitously declined over the last years 30,000 inmates or 14% over the last four years. So, the decision of where we need future prisons is made based on information we receive from the FBOP. The FY2018 budget does request 80 million dollars to open a prison that has already been built and this will add 2500 high-security beds. So, what we are doing Congressman is prioritizing our spending given the tight budget. But, we would certainly be open to working with the committee in the future if there were a need for additional bed-space. Given the projections and needs the FBOP just didn't feel that we needed that facility at this time.

123.

Despite this clear directive from the DOJ, the BOP states in its ROD that "[t]he **purpose** of the proposed federal correctional facility in Letcher County is to develop additional high-security facilities to increase capacity for current inmate populations in the Mid-Atlantic Region based on the need for additional bed space." As stated, the BOP's supposed purpose and need for USP Letcher directly contradicts the DOJ's statements in

sworn testimony to Congress and in submission to the House Budget Committee without explanation. With its 2018 Budget Request, the DOJ and the BOP make clear that a new prison at the Roxana site is not needed.  Several public comments raised this concern to the BOP.  Yet despite DOJ's unambiguous testimony stating otherwise, the BOP has purported a need for a new high security facility.

124.

### iv.     The BOP's FSREIS' and ROD's overly narrow purpose and need foreclosed sufficient consideration of reasonable alternatives.

The BOP's FSREIS' and ROD's overly narrow purpose and need assumed that the agency would develop a USP in Letcher County, Kentucky based on a 2005 determination. This assumption foreclosed sufficient consideration of reasonable alternatives.  BOP's purported need to build USP Letcher is to relieve overcrowding in current high-security facilities within the agency.  There are a range of alternatives that can meet this objective without building USP Letcher or any new facility.

125.

For instance, as mentioned in its FY2018 Budget Request the DOJ makes clear that the full activation of an already existing high-security facility at Thomson would have the desired effect of significantly reducing crowding in high-security prisons, while costing taxpayers only $80 million instead of the more than $444 million that would be required to build a new prison at the Roxana site. This alternative would have lower environmental impacts than building an entirely new facility in Roxana, Kentucky because the alternative facility (AUSP Thomson) has already been built and is partially operational.

126.

Beyond failing to explain in the ROD why the AUSP Thompson alternative provided in its FY2018 Budget Request has not been discussed, the BOP also failed to analyze any of the following additional alternatives in order to meet its obligations under NEPA.

127.

a.    **BOP Could Renovate Existing Facilities to Increase High-Security Capacity**

The BOP should consider repurposing lower-security facilities in the Mid-Atlantic to house high-security prisoners. Population numbers from 2018 indicate that the BOP has excess capacity for inmates across its non-high-security facilities. The BOP could consolidate its non-high-security prisoners into facilities with excess capacity, thereby opening up facilities for renovation into high-security prisons.

128.

In fact, as discussed by former BOP employee Tim Gravette[2] in his comments on the FSREIS, the BOP has a history of converting facilities to accommodate different classification needs. For instance, USP Lompoc, USP Atlanta, USP Marion, and USP Leavenworth were all at one point high-security penitentiaries.  However, they all now house medium-security inmates.  One of these facilities could be converted again to run as a penitentiary (likely for a fraction of the cost of building a new USP) to address overcrowding issues.

129.

---

[2] Tim Gravette is a twenty-six year corrections veteran and retired from the Federal Bureau of Prisons.  Post-retirement, he has stayed active in the corrections industry by conducting audits, becoming a DOJ certified PREA auditor and doing consulting for agencies and attorneys.

Additionally, the BOP's website says that it is contracting to hold 1,345 of its prisoners at the privately operated Correctional Institution (CI) Rivers in the Mid-Atlantic Region. According to the operator of CI Rivers, the BOP is the sole client for the prison, which has a capacity of 1,450 prisoners. By shifting more of its non-high-security population to contract prisons in the Mid-Atlantic Region, the BOP could further facilitate the renovation of an existing facility to hold high-security prisoners.

130.

The BOP must take account of where in its system it currently has excess capacity, and whether consolidating its non-high-security population into fewer facilities would allow for already existing prisons to be renovated to hold high-security prisoners. This alternative would have a much smaller environmental impact than building and operating new facilities on undeveloped and remote land, and it would likely save millions of dollars in taxpayer money.

131.

### b. BOP Could Take Administrative Actions to Reduce its Population and/or Reduce Classification of Prisoners as High-Security

Recent innovations have shown that alternatives to building new prisons can be reasonably implemented within the BOP that can save scarce financial and human resources. The RSEIS impermissibly dismisses this possibility where it states that "[t]he Bureau is not the agency responsible for developing sentencing guidelines or alternatives to current sentencing guidelines."

132.

However, the BOP undisputedly has powers to reduce prison populations on its own, and has repeatedly come under fire for failing to utilize those powers. Notably, BOP

44

has significant power to recommend reductions in sentences for extraordinary and compelling circumstances. For instance, such sentence reductions can be based on either medical or non-medical conditions that justify a reduction in sentence.

133.

As mentioned in several comments to the BOP during the NEPA process, numerous reports have criticized BOP for failing to utilize this power or develop a standardized system to evaluate extraordinary and compelling circumstances. Federal law also authorizes BOP to release prisoners to residential facilities or home confinement. Additionally, as the BOP's population continues to grow older, it should have more opportunities to use its discretion to safely reduce sentences and release prisoners.

134.

Tim Gravette discusses in detail the use of compassionate release in his comments. BOP has an aging population and the authority to work to move these inmates out of its custody.  There are approximately 4,770 elderly inmates who could qualify for sentencing reductions.



135.

A federal Office of the Inspector General Report referenced by several comments to the BOP during the NEPA process discusses the aging of the BOP's prisoner population, and how this situation lends itself to reducing the security classifications of thousands of prisoners. The same report also indicates that there is an increasing opportunity for the BOP to reduce its population by providing compassionate and medical release to elderly prisoners. According to this report, prisoners over the age of 50 "were the fastest growing segment" of the population incarcerated by the BOP. These prisoners are also significantly less likely to commit misconducts while imprisoned, which suggests that as the BOP's population ages, fewer and fewer prisoners should qualify for "high-security" classification. Additionally, the OIG Report finds that by relaxing the eligibility requirements for its compassionate release program -- thereby increasing the number of prisoners released through this program -- the BOP would achieve "significant cost savings… as well as assist in managing the inmate population."

136.

Increasing staff support to reduce this population, would without doubt ease the financial and logistical burdens associated with BOP's inmate population. The BOP's failures on this account continue to face criticism at the highest levels of government, most recently in a letter from 11 senators of both parties pressing for increased use of compassionate release.  Despite such a cost-saving alternative to meet the asserted need to reduce overcrowding, the BOP's FSREIS and ROD completely fails to account for this alternative.

137.

A different 2016 Office of Inspector General (OIG) Report found that there were 4,340 untimely releases of prisoners from the BOP system between 2009 and 2014. The

OIG investigation was stymied by the manner in which BOP tracks untimely releases, so that detailed information on 4,183 of these errors was not available. This is because the BOP's system for handling mistakes in sentence computations only reviews for BOP staff error. If an untimely release is deemed to have been caused by another agency, then the BOP notes as much, but nothing more. Of the 157 untimely releases that were listed as caused by BOP staff error, the vast majority led to prisoners serving more time than they had been sentenced to, and in several cases more than a year. This is a significant number that needs to be addressed.  Holding individuals over their sentences is not only inappropriate, it has the effect of keeping more people imprisoned, thereby creating or exacerbating crowding in the system. Nevertheless, the ROD and FSREIS fails to account for the alternative of fixing the overdetention problem within the BOP rather than building a new facility.

138.

The BOP's ROD and FSREIS also failed to consider the alternative of using incentives to help prisoners reduce their security risk classification. According to a report by the 2016 Charles Colson Task Force on Federal Corrections (Colson Report), the BOP reduced the security level classification of "45 percent of those initially classified as high risk" and "21 percent of those initially classified as medium risk" during FY 2014. By expanding its system of incentives and privileges, as recommended by the Colson Report, the BOP could further reduce security risk classifications for prisoners held at high-security facilities, thereby reducing overcrowding at those facilities.  Comments to the BOP during the NEPA process provide concrete evidence that the BOP over-classifies individuals. Properly classifying inmates would more than likely reduce the current percentage of high security inmates under BOP's custody.

139.

**v.      BOP Failed to Take a "hard look" at the direct, indirect and cumulative public health impacts of building USP Letcher.**

Despite known scientific data concerning the increased health risks of living in close proximity to active and/or former coal mines, BOP totally failed to take a "hard look" at its site location for USP Letcher could impact the health of the correctional officers and inmates working and living at the prison.  The EIS completely disregards this issue by omitting it from any analysis.

140.

Concerned citizens and organizations repeatedly raised this issue to the BOP throughout the NEPA process with requests to gather and assess data from other similarly situated prisons, including but not limited to Wallens Ridge State Penitentiary (Va.), Red Onion State Penitentiary (Va.) and SCI Fayette (Pa.).  These facilities are built near existing coal operations, and Wallens Ridge and Red Onion are built on former MTR sites.  A study that compares health data of these inmates and staff to those of facilities not in the heart of coal country is needed before any final decision about the siting of this facility.  The BOP ignored these concerns in its SEIS and ROD.

141.

BOP's ROD and EIS is not compliant with NEPA because it failed to take a "hard look" at these legitimate public health impacts associated with the construction and activation of USP Letcher.

142.

**vi.      BOP's NEPA documents and ROD Failed to Conduct an Environmental Justice Analysis**

48

The proposed prison facility is a combined residential and industrial use of land comprised of massively warehousing federal inmates.

143.

The racial demographics and socioeconomic status of prisoners projected to populate the facility can be reasonably based on the demographics of other BOP facilities across the country. Racial minorities are disproportionately represented in the nationwide prison population to such an extreme extent that incarceration trends have been referred to as the new Jim Crow. The BOP reports 41 percent of its population to be of non-white "minority" status, whereas this racial demographic only makes up approximately 25 percent of the entire U.S. population.

144.

The people most likely to be housed at USP Letcher will be people of color and low-income people; and would therefore meet the criteria to be considered an Environmental Justice community under Executive Order 12,898. There are significant and unique health and safety hazards to environmental conditions in Appalachian coal mining regions. Yet the BOP's position is that it "does not concur with the assertion that federal inmates of mixed background (as to ethnicity, race and income) to be housed in the proposed facilities constitute either a minority or low income population for the purposes [of] EO12898." In turn, it failed to conduct any sort of environmental justice analysis in its EIS, SEIS and ROD.

## CAUSES OF ACTION

**CLAIM 1:**     **Violation of NEPA and the APA Due to the Defendant's Failure to Comply with NEPA's Procedural Mandates for Public Involvement**

145.

Plaintiffs re-allege and incorporate by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

146.

Defendant BOP violated the procedural mandates articulated in 40 C.F.R. § 1506.6 that describe the required efforts of an agency to meaningfully include the public in its decision making process.  This regulation requires BOP to "[p]rovide public notice of NEPA-related hearings, public meetings, *and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected*." (emphasis added).  Upon information and belief, the BOP did not provide public notice or access to the Plaintiffs via their facility's inmate law library.

147.

BOP's own internal policy also requires that "Federal Register documents . . . pertaining to the Bureau and to the U.S. Parole Commission are to be maintained in the institution's inmates law libraries.  Maintaining these documents in the inmate law libraries is intended to ensure that inmates have the opportunity to participate in the rulemaking process.

148.

The incarcerated plaintiffs are all in the custody of the BOP and are members of the social sector that will be the profoundly affected by this particular agency action, as they face the risk of being relocated against their will to the new facility.  Consequently, they are the most likely to face adverse health risks from living atop of a former mining site in a region plagued by unsafe drinking water and widespread environmental pollution.

149.

Defendant BOP acted arbitrarily and capriciously in its failure to provide the Plaintiffs with notice of its public comment periods and access to USP Letcher's NEPA documents.  Such action deprived the Plaintiffs of their statutory and democratic rights to provide comment on major federal action that impacts the environment.

150.

The actions and inactions of Defendant BOP as described in this Claim for Relief have and are causing injuries to the incarcerated plaintiffs, for which they have no adequate remedy at law.

**CLAIM 2:    Violation of NEPA and APA Due to Defendant BOP's Reliance on an Inaccurate and Unjustifiable "Purpose and Need" Statement**

151.

Plaintiffs re-allege and incorporate by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

152.

Defendant BOP has violated NEPA, making its EIS and ROD for the USP Letcher Project invalid because it has relied on the inaccurate and unjustifiable reasoning that it needs to build USP Letcher in order to reduce overcrowding of high-security inmates in the Mid-Atlantic Region.  This "purpose and need" utterly fails to account for 1) the proposed agency action to build an adjacent satellite camp for low-security inmates; and 2) BOP and the DOJ's repeated statements to Congress that in fact it does not need to build USP Letcher.

153.

These BOP failures render its EIS documents inadequate, and as such, the issuance of the ROD was and is arbitrary and capricious, an abuse of discretion and not in accordance with law, in violation of NEPA and the APA.

154.

The actions and inactions of Defendant BOP as described in this Claim for Relief have and are causing injuries to Plaintiffs, for which they have no adequate remedy at law.

**CLAIM 3:      Violation of NEPA and APA Due to Defendant BOP's Reliance on an Improperly Narrow "Purpose and Need" Statement**

155.

Plaintiffs re-allege and incorporate by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

156.

NEPA and its implementing regulations require agencies to consider a full range of reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C), (E). Indeed, the alternatives analysis is "the heart" of the NEPA process, and is intended to provide a "clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(C)(iii), (E). NEPA and its implementing regulations require an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

157.

Defendant BOP has violated NEPA, and its NEPA documents and ROD are invalid, because they failed to rigorously explore and evaluate all reasonable alternatives. The scope of a NEPA alternatives analysis is a function of the "purpose and need" for the agency action under review. *See* 40 C.F.R. § 1502.13. Defendant BOP impermissibly confined the

scope of their NEPA analysis by improperly defining the purpose and need for the agency action, which in turn precluded analysis of a broad array of potential environmental impacts, as well as reasonable alternatives. Alternatively, even if Defendant BOP did not impermissibly winnow the purpose and need of its action, it ignored several reasonable alternatives as described herein.

158.

Defendant BOP arbitrarily and capriciously failed to adequately consider or address other reasonable and feasible alternatives as discussed by the Abolitionist Law Center and several other individuals and organizations that provided concerned comment to BOP throughout the EIS process.

159.

Defendant BOP's failure to adequately explore other alternatives besides building a new penitentiary to reduce overpopulation of its high-security inmates renders its ROD and EIS documents inadequate.  In turn, BOP's reliance on its EIS documents in issuing the ROD was and is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, in violation of NEPA and the APA.

160.

**CLAIM 4:    Violation of NEPA and the APA for Failing to Take a Hard Look at the Proposed Action's Environmental Impacts**

Plaintiffs re-allege and incorporate by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

161.

NEPA's implementing regulations require the BOP to assess the environmental impacts of the proposed action, including direct effects and indirect effects that are reasonably foreseeable but removed in time or space. *See* 42 U.S.C. § 4332(2)(C); 40

C.F.R. §§ 1508.7-.8. As part of its analysis, NEPA requires Defendants to take a hard look at the potential health impacts of its action, 40 C.F.R. § 1508.8, including harm to future employees and inmates. NEPA further requires BOP to use high quality, accurate scientific information, and to ensure the scientific integrity of this analysis. *See* 40 C.F.R. §§ 1500.1(b), 1502.24.

162.

NEPA and its implementing regulations require the scope of Defendant BOP's analysis to include "connected actions" that "[a]utomatically trigger other actions," "[c]annot or will not proceed unless other actions are taken previously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25. An agency may not refuse analysis of reasonably foreseeable, site-specific environmental consequences of the proposed action. *See* 40 C.F.R. §§ 1501.2; 1502.2(g); 1502.5.

163.

BOP ignored uncontroverted data that suggests serious public health concerns for those that live near former and active coalmines in Appalachia. Its EIS, SEIS and ROD failed to consider the public health impacts that the site of its proposed action could have on BOP employees and inmates.

164.

Defendant BOP's failures render the its EIS and SEIS inadequate, and as such, its reliance on these documents in issuing the ROD was and is arbitrary and capricious, otherwise not in accordance with law, and without observance of procedures required by law, in violation of NEPA and the APA.

165.

**CLAIM 5:    Violation of NEPA and APA for Failure to Conduct an Environmental Justice Analysis.**

Plaintiffs re-allege and incorporate by reference the allegations set forth in the entirety of this Complaint as if fully set forth herein.

166.

The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a "disproportionately high and adverse" impact on low-income and predominantly minority communities. *See* J.A. 1353-54. Executive Order 12,898 required federal agencies to include environmental-justice analysis in their NEPA reviews.   Like the other components of an EIS, an environmental justice analysis is measured against the arbitrary-and-capricious standard. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689, 359 U.S. App. D.C. 383 (D.C. Cir. 2004). The analysis must be "reasonable and adequately explained." *Id.*

167.

Excluding an environmental justice analysis in an EIS and SEIS where the impact of a proposed project without doubt disproportionately impact a community of people of color and low-income people violates  NEPA's environmental justice requirement for an EIS.

168.

Defendant BOP's failures render the its EIS and SEIS inadequate, and as such, its reliance on these documents in issuing the ROD was and is arbitrary and capricious, otherwise not in accordance with law, and without observance of procedures required by law, in violation of NEPA and the APA.

**RELIEF REQUESTED**

**WHEREFORE,** Plaintiffs request that after all due proceedings had in this case that this Honorable Court

1.     Adjudge and declare BOP's ROD issued in connection with its EIS documents in support of its decision to build USP Letcher to be a violation of NEPA and the APA;

2.     Vacate and set aside Defendants' actions;

3.     Remand this matter to BOP to reopen the public comment period with a requirement that the BOP make all future federal register notices and EIS documents available to federal inmates at their facilities' inmate law libraries.

4.     Enjoin BOP from taking any action pursuant to building USP Letcher until it demonstrates compliance with NEPA, the APA, and its own notice regulations;

5.     Retain jurisdiction over this matter until Defendants fully remedy the violations described herein;

6.     Award Plaintiffs reasonable attorney's fees, costs, expenses, and disbursements associated with this litigation; and

7.     Grant Plaintiffs any other general and equitable relief that this Court may deem appropriate under the circumstances.

Respectfully Submitted,

*/s/ Dustin McDaniel*
Dustin McDaniel (Pa. Bar No. 314618)
Abolitionist Law Center
P.O. Box 8654
Pittsburgh, PA 15221
Telephone: (412) 651-7485
dsm@abolitionistlawcenter.org

*/s/ Emily H. Posner*
Emily H. Posner (La. Bar No. 35284)
7214 St. Charles Box 913
New Orleans, Louisiana 70118
Phone: (225) 746-8820
emilyposnerlaw@gmail.com
*Pending Pro Hac Vice Admission*

*Attorneys for Plaintiffs*

56